UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

DANA CAMPBELL,                          )
                                        )
    Plaintiff,                      )   Civil No. 5:18-cv-194-JMH
                                        )
v.                                      )
                                        )
HARTFORD LIFE AND ACCIDENT              )    **MEMORANDUM OPIONION**
COMPANY, d/b/a THE HARTFORD,            )       **AND ORDER**
                                        )
    Defendant.                      )

** ** ** ** **

Plaintiff Dana Campbell brings this action pursuant to the Employment Retirement Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), against Defendant Hartford Life and Accident Insurance Company, doing business as The Hartford ("Hartford"). Mrs. Campbell seeks to recover supplemental benefits under her spouse Gary Campbell's group life insurance policy (the "Policy"), which Hartford issued to Mrs. Campbell's employer, AECOM. Following Mr. Campbell's death on December 20, 2016, Hartford paid a $10,000.00 basic life insurance benefit to Mrs. Campbell, Mr. Campbell's sole beneficiary, but Hartford denied supplemental dependent life insurance benefits in the amount of $190,000.00 on the basis that Mr. Campbell allegedly made a misrepresentation on his life insurance application. Presently before the Court are Mrs. Campbell's Memorandum in Opposition to Administrator's

Decision [DE 21], Hartford's Response [DE 24], and Mrs. Campbell's Reply [DE 25]. Accordingly, this matter is fully briefed and ripe for review. Having reviewed the Administrative Record ("AR") [DE 18-2] and the Parties' Briefs [DE 21; DE 24; DE 25], and being otherwise sufficiently advised, the Court will reverse Hartford's decision to deny Mrs. Campbell's claim for her husband's supplemental life insurance benefit and rescind coverage and order Hartford to remit the $190,000.00 supplemental life insurance benefit to Mrs. Campbell.

## I. BACKGROUND

### A. DECEDENT'S MEDICAL HISTORY AND TREATMENT FOR ALCOHOL USE

Prior to moving from Utah to Kentucky in September 2013, Mr. Campbell had been sober for four (4) years. [AR 716]. However, when Mr. Campbell was first living in Kentucky, he was not working and had an episode of heavy drinking in which he drank six (6) shots of alcohol per day. *Id.* at 734. In August 15, 2014, while seeking treatment for his hypertension, Mr. Campbell reported his alcohol use to his physician, Dr. Sandra Dionisio, at White House Clinics. *Id.*

On March 10, 2015, Mr. Campbell visited Dr. Dionisio again, and shared more information about his alcohol use. *Id.* at 716. In the few weeks that preceded the visit, Mr. Campbell had gotten "drunk several times" and "really drunk over the weekend." *Id.* His last drink had been two (2) days prior to his March 10, 2015,

doctor's visit. *Id.* Mr. Campbell had been attending Alcoholics Anonymous ("AA") meetings, but he "stopped going when he started drinking." *Id.* Both Mrs. Campbell and Mr. Campbell's AA sponsor advised Mr. Campbell to detox, but he "resisted," fearing "he might lose his spot in [his] PhD program." *Id.* Also, Mr. Campbell reported that "[h]is wife told him to stop o[r] she wants a divorce," and he felt that if that happened "he [would] lose everything." *Id.* Mr. Campbell requested that Dr. Dionisio prescribe Mr. Campbell Antabuse, but instead of just prescribing medication, Dr. Dionisio "[d]iscussed that [she] would rather he be part of a comprehensive program to help with alcohol dependence" and stated, "He is planning to attend AA consistently from here on." *Id.* at 716-18. Finding Mr. Campbell's hypertension was "[u]ncontrolled due to excessive alcohol use," Dr. Dionisio diagnosed Mr. Campbell with "Alcohol dependence (303.90)" and referred him to a psychiatrist. *Id.* at 718.

On May 9, 2015, Mr. Campbell returned to White House Clinics and met with Dr. Brad Williams. *Id.* at 712. Mr. Campbell reported that "he had a day [the previous] week when he 'went on a tear'" and "can control urges to drink for 2-2 we[e]ks and then will try to have '[j]ust a couple of drinks' but can't limit it to that." *Id.* At the time of his visit with Dr. Williams, Mr. Campbell was going to "AA at least a couple of times a week" and "seeing a counselor every 2 weeks." *Id.* Also, Mr. Campbell shared that he

was working nights and only drinking during the day. *Id.* Again, Mr. Campbell expressed fear that he "'may lose [his] marriage over this.'" *Id.* After relaying Dr. Dionisio's treatment plan to Dr. Williams, including Mr. Campbell's requests that he be prescribed Antabuse, Mr. Campbell reported that "he has been on the internet and has learned that there are possibly other meds he could take" and mentioned Topamax. *Id.* Like Dr. Dionisio, Dr. Williams diagnosed Mr. Campbell with "Alcohol Dependence (303.90)," but unlike Dr. Dionisio, Dr. Williams prescribed Mr. Campbell a "low dose of [T]opamax for 1 month." *Id.* at 714. In addition to prescribing Topamax, Dr. Williams ordered Mr. Campbell to follow up with Dr. Dionisio in one (1) month and continue going to AA and seeing a counselor. *Id.*

## B. RELEVANT POLICY PROVISIONS

As an employee of AECOM, Mrs. Campbell was covered under AECOM's benefit plan (the "Plan"), which included the Policy Hartford issued to AECOM, the Policyholder. Under the Policy, in addition to basic life insurance, Mrs. Campbell could elect to have both supplemental life insurance and supplemental dependent life insurance coverage. *Id.* at 13-16. Mrs. Campbell elected to have supplemental dependent life insurance coverage for her husband, Mr. Campbell, which included a "Guaranteed Issue Amount" of $10,000.00 and an additional "Maximum Amount" of $190,000.00. *Id.* at 839. While the "Guaranteed Issue Amount" did not require

evidence of insurability, the additional "Maximum Amount" did, including the completion of a Personal Health Application. *Id.* at 839-40. The additional coverage amount was based on the information provided in the Personal Health Application and was approved on November 10, 2015. *Id.* at 847.

The Personal Health Application asked several questions regarding Mr. Campbell's medical information, including Question No. 4, which asked the following:

> Within the past 5 years, have you used any controlled substances, with the exception of those taken as prescribed by your physician, been diagnosed or treated for drug or alcohol abuse (excluding support groups), or been convicted of operating a motor vehicle while under the influence of drugs or alcohol?

*Id.* at 839-40. In response to Question No. 4, the Campbells checked "No." *Id.* at 840.

The Policy included an "Incontestability" provision that started the following:

> Except for non-payment of premiums, Your or Your Dependent's Life Insurance Benefit cannot be contested after two years from its effective date.
>
> In the absence of fraud, no statement made by You or Your Spouse relating to Your or Your Spouse's insurability will be used to contest Your insurance for which the statement was made after Your insurance has been in force for two years. In order to be used, the statement must be in writing and signed by You and Your Spouse.
>
> No statement made relating to Your Dependents being insurable will be used to contest their insurance for which the statement was made after their insurance has been in force for two years. In order to be used, the

> statement must be in writing and signed by You or Your
> representative.
>
> All statements made by the Policyholder, the Employer or
> You or Your Spouse under The Policy will be deemed
> representations and not warranties. No statement made to
> affect this insurance will be used in any contest unless
> it is in writing and a copy of it is given to the person
> who made it, or to his or her beneficiary or Your
> representative.

*Id.* at 29. Additionally, the Policy stated, "[Hartford has] full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy. This provision applies where the interpretation of The Policy is governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA)." *Id.*

## C. DECEDENT'S DEATH AND PLAINTIFF'S LIFE INSURANCE CLAIM

On April 13, 2016, Mr. Campbell was diagnosed with esophageal cancer. *Id.* at 468. On April 12, 2016, April 18, 2016, and April 21, 2016, Mr. Campbell's oncologists noted "prior alcohol abuse" and that Mr. Campbell had a "[h]istory of alcohol abuse." *Id.* at 465, 479, 483. On December 20, 2016, Mr. Campbell died of esophageal cancer. *Id.* at 812. Mrs. Campbell submitted a claim for life insurance benefits under the Policy, and Hartford paid the non-contestable $10,000.00 basic life insurance benefit to Mrs. Campbell. *Id.* at 80, 119-20, 828-35. However, pursuant to the incontestability provision of the Policy and because Mr. Campbell's death occurred within the two (2) years of the effective

date of the supplemental dependent life insurance coverage, before paying the remaining $190,000.00 under the Policy, Hartford conducted a review of the Campbells' answers on the Personal Health Application and cross-referenced those answers with Mr. Campbell's medical records. *Id.* at 80, 119-20.

Once Hartford received Mr. Campbell's medical records, its Claim Office referred the matter to Hartford's Medical Underwriting unit, which determined that had Hartford had access to Mr. Campbell's medical records, supplemental dependent life insurance coverage would not have been approved. *Id.* at 449. Specifically, on March 21, 2017, the Medical Underwriter decided that due to Mr. Campbell's Alcohol Dependence diagnosis, which the Medical Underwriter found pertained to Question No. 4 on the Personal Health Application, Hartford would have declined coverage. *Id.* at 65, 449. On April 3, 2017, Hartford's Claim Analyst, Cheryl LeFort, wrote Mrs. Campbell to inform her that her claim for benefits had been denied, coverage had been rescinded, and Mrs. Campbell had sixty (60) days to provide Hartford additional information or appeal. *Id.* at 95-98. Ms. LeFort asserted that Hartford's decision was based on the Campbells' answers on the Personal Health Application and Mr. Campbell's medical records from his May 2015 visit at White House Clinics, which allegedly indicate Mr. Campbell "was treated for alcohol abuse." *Id.*

On May 1, 2017, Mrs. Campbell requested a copy of her claim file, and ten (10) days later, Hartford provided her a copy of the claim file. *Id.* at 94. On May 3, 2017, Mrs. Campbell sent Ms. LeFort a letter of appeal, submitting additional information and asserting, "On May 1, 2017, Dr. Sandra Dionisio sent a letter (attached) in which she explained that my deceased husband, Gary Campbell, 'never sought treatment for alcohol use.' Therefore, <u>our answer to question #4 on Gary's health history does not contradict the medical documentation</u>." *Id.* at 367 (underlined in original). Dr. Dionisio's May 1, 2017, letter states the following:

> "I saw Gary on 3/21/2015 where he requested medication for recurrence of his alcohol use. At that time, he was referred but never sought treatment for alcohol use. I think their understanding when queried in the Insurance form was if he ever sought active treatment which he actually never did."

*Id.* at 369.

On May 16, 2017, Hartford notified Mrs. Campbell by letter that it had reviewed the additional information Mrs. Campbell had provided, and the decision to deny the claim would be maintained. *Id.* at 91-92. While Hartford acknowledged Dr. Dionisio's May 1, 2017, letter asserting that based on Dr. Dionisio's March 21, 2015, visit with Mr. Campbell, the Campbells answered Question No. 4 accurately, Hartford directed Mrs. Campbell's attention to Hartford's April 3, 2017, letter, which stated that in making its decision, Hartford relied on medical records from Mr. Campbell's

May 9, 2015, White House Clinics visit with Dr. Williams not Mr. Campbell's March 21, 2015, White House Clinics visit with Dr. Dionisio. *Id.*

On October 2, 2017, Mrs. Campbell's counsel appealed Hartford's decision again, submitting additional information in the form of affidavits and statements from people who knew Mr. Campbell "did not personally witness signs or symptoms of alcohol abuse" and were unaware of a "medical diagnosis or treatment" for alcohol abuse. *Id.* at 144-48. Additionally, Mrs. Campbell's October 2, 2017, letter argues Alcohol Dependence and Alcohol Abuse are two separate diagnoses with different diagnostic codes. *Id.* The provided diagnostic codes for Alcohol Dependence and Alcohol Abuse read as follows:

**Alcohol Dependence - Diagnostic Code 303.90**

A maladaptive pattern of alcohol use, leading to clinically significant impairment or distress, as manifested by three (or more) of the following, occurring at any time in the same 12-month period:

1. Tolerance, as defined by either of the following:
a. A need for markedly increased amounts of alcohol to achieve Intoxication or desired effect
b. Markedly diminished effect with continued use of the same amount of alcohol
2. Withdrawal, as manifested by either of the following:
a. The characteristic withdrawal syndrome for alcohol (refer to Criteria A and B of the criteria sets for Withdrawal from alcohol)
b. Alcohol (or a closely related drug such as valium) is used to relieve or avoid withdrawal symptoms
3. Alcohol is often used in larger amounts or over a longer period than was intended

4. There is a persistent desire or unsuccessful efforts to cut down or control alcohol use
5. A great deal of time is spent in activities necessary to obtain alcohol, use alcohol, or recover from its effects
6. Important social, occupational, or recreational activities are given up or reduced because of alcohol use
7. Alcohol use is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by alcohol (e.g. continued drinking despite recognition that an ulcer was made worse by alcohol consumption)

**Specifiers:**

• With Physiological Dependence: evidence of tolerance or withdrawal (i.e., either Item 1 or 2 is present)
• Without Physiological Dependence: no evidence of tolerance or withdrawal (i.e., neither Item 1 nor 2 is present)

**Course specifiers**

• Early Full Remission
• Early Partial Remission
• Sustained Full Remission
• Sustained Partial Remission
• On Agonist Therapy
• In a Controlled Environment

(Note--a diagnosis of Alcohol Dependence can never be changed to a diagnosis of Alcohol Abuse. The DSM also states that "The differentiation of Sustained Full Remission from recovered (no current Substance Abuse Disorder) requires consideration of the length of time since the last period of disturbance, the total duration of the disturbance, and the need for continued evaluation.")

from DSM-IV-TR[.]

The HAMS: Harm Reduction Network, *available at*: http://hams.cc/dependence/ (last visited Oct. 2, 2017.) This is distinguishable from alcohol **abuse**:

**Alcohol Abuse - Diagnostic Code 305.00**

A. A maladaptive pattern of alcohol use leading to clinically significant impairment or distress, as manifested by one (or more) of the following, occurring within a 12-month period:

(1) recurrent alcohol use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., repeated absences or poor work performance related to alcohol use; alcohol-related absences, suspensions, or expulsions from school; neglect of children or household)

(2) recurrent alcohol use in situations in which it is physically hazardous (e.g., driving an automobile or operating a machine when impaired by alcohol use)

(3) recurrent alcohol-related legal problems (e.g., arrests for alcohol-related disorderly conduct)

(4) continued alcohol use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the alcohol (e.g., arguments with spouse about consequences of Intoxication, physical fights)

B. The symptoms have never met the criteria for Alcohol Dependence.

(Note that there are no course specifiers for Alcohol Abuse. A diagnosis of Alcohol Abuse is for life--it can never be removed from your medical chart no matter how much you improve.)

from DSM-IV-TR[.]

The HAMS Harm Reduction Network, *available at*: http://hams.cc/abuse/ (last visited Oct. 2, 2017).

*Id.* at 145-47.

On February 1, 2018, Hartford upheld its decision to deny Mrs. Campbell's claim for supplemental dependent life insurance benefits and stated that Hartford's "claim decision is now final

as administrative remedies available under the Policy have been exhausted." *Id.* at 86-88. Subsequently, on February 14, 2018, Mrs. Campbell filed suit in the Madison Circuit Court, which she later removed to this Court on March 22, 2018, challenging Hartford's denial of her claim for supplemental dependent life insurance benefits. [DE 1].

## II. STANDARD OF REVIEW

### A. JUDICIAL ESTOPPEL

Before determining which standard of review is applicable, the Court will address Hartford's argument that the doctrine of judicial estoppel prevents Mrs. Campbell from "arguing the 'Certificate of Insurance' with the Administrative Record is the Plan document for purposes of awarding her benefits, but is not the Plan document for purposes of granting discretion." [DE 24, at 9 (citing *Hogan v. Life Ins. Co. of North America,* 521 F. App'x 410, 415-16 (6th Cir. 2013); *Beasley v. Unum Life Ins. Co.,* No. 13-CV-12349, 2015 WL 4966875, at *6 (E.D. Mich. Aug. 20, 2015) (finding the plaintiff was judicially estopped from "argu[ing] that Beasley was entitled to benefits under the terms of the specimen policy in the first instance, but then argu[ing] that unfavorable terms in the specimen policy do not warrant termination of benefits in subsequent litigation")]].

"The equitable doctrine of judicial estoppel precludes 'a party who successfully assumed one position in a prior legal

proceeding from assuming a contrary position in a later proceeding.'" *Beasley,* 2015 WL 4966875, at *4 (quoting *Mirando v. U.S. Dep't of the Treasury,* 766 F.3d 540, 545 (6th Cir. 2014)). "In order to prevent a party from proverbially 'trying to have their cake and eat it too,' judicial estoppel seeks to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'" *Id.* (quoting *Lucier v. City of Ecorse,* 601 F. App'x. 372, 377 n. 2 (6th Cir. 2015); *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe,* 546 F.3d 752, 757 (6th Cir. 2008) (same)). To determine whether the doctrine of judicial estoppel should be invoked, the Court considers the following factors:

> (i) whether the party's later position is "clearly inconsistent with its earlier position; (ii) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (iii) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party is not estopped."

*Id.* (citing *Mirando,* 766 F.3d at 545; *accord Zedner v. United States,* 547 U.S. 489, 504 (2006)). "These factors are merely considerations and are not alone dispositive." *Id.* (citing *Pavelka v. Allstate Property & Cas. Ins. Co.,* 91 F. Supp. 3d 931, 2015 WL 1221393, at *4 (E.D. Mich. 2015)).

In *Hogan,* the Sixth Circuit Court of Appeals found, "[T]o the extent Hogan challenges the validity of a non-filed policy, she should not be able to have her cake and eat it too—either the policy is valid or it is not. She cannot seek the benefits contained in the policy while rejecting procedural language adverse to her."

In the present case, unlike the plaintiff in *Hogan,* Mrs. Campbell is not challenging the validity of procedural language in a non-filed policy. While the Group Policy [DE 24-3] referenced in Hartford's Response [DE 24, at 9] is not found in the Administrative Record [DE 18-2], Mrs. Campbell is not challenging the validity of the Group Policy [DE 24-3]. *See* [DE 25, at 4-5]. Instead, Mrs. Campbell is arguing the booklet-certificate that contains language granting discretionary authority to Hartford is a summary document that may not be considered part of the Plan. *See* [DE 21; DE 25]. Moreover, Mrs. Campbell is not rejecting the language granting discretionary authority because it is adverse to her; she is rejecting the language because it is not part of the Plan.

In *Beasley*, during prior litigation, "Plaintiffs took the position in *Beasley I* that the terms of the specimen policy controlled the outcome of the dispute among the parties regarding Beasley's entitlement to disability benefits, albeit under a different provision than the one at issue in the present matter."

*Beasley,* 2015 WL 4966875, at *5 (citation omitted). The plaintiffs
then asserted "the position that the specimen policy does not
govern Beasley's present eligibility for disability benefits,"
which the Court, finding the first factor for judicial estoppel
was satisfied, held was "clearly inconsistent with the position
asserted in the prior proceedings." *Id.* The second factor for
judicial estoppel was satisfied because "the Court accepted
Plaintiffs' prior position and relied on the language of the
specimen policy in rendering its decision in favor of Plaintiffs
in the prior litigation." *Id.* (citation omitted). Since "the
parties stipulated to the Court's use of the specimen policy in
reaching its decisions on reasonableness and damages. Defendants
continued to provide Beasley with disability benefit payments for
nearly 12 years, in accordance with the Court's earlier opinions."
*Id.* Accordingly, the *Beasley* Court found the third factor for
judicial estoppel was also satisfied because the "Plaintiffs would
gain an unfair advantage, and Defendants would be prejudiced." *Id.*

Here, unlike *Beasley,* the three factors for judicial estoppel
are not present. First, regarding the first factor, Mrs. Campbell's
position is not "clearly inconsistent" with her earlier position.
*Id.* at 4. As previously mentioned, arguing the booklet-certificate
is not a Plan document is not analogous to *Hogan*, and at no time
throughout this litigation has Mrs. Campbell changed her position
that the booklet-certificate is not part of the Plan. Furthermore,

Hartford admits, "Hartford issued [the Policy] to AECOM to insure the life insurance component of component of [the Plan], which is an 'employee welfare benefit plan,' 29 U.S.C. § 1002(1), pursuant to ERISA. Plaintiff was a participant in the Plan based on her employment with AECOM." [DE 1, at 3]. Accordingly, there is no argument that Mrs. Campbell was covered by the Policy. What is at issue in this matter is whether the documents Hartford has provided as either the Policy or the Plan are, indeed, the Policy or Plan documents or merely a plan summary, as Mrs. Campbell contests.

Regarding the second factor, since Mrs. Campbell has not taken inconsistent positions, she has not "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Beasley,* 2015 WL 4966875, at *4. The Court finds the third factor as equally lacking as the first two factors for judicial estoppel because Mrs. Campbell is not "seeking to assert an inconsistent position [that] would derive an unfair advantage or impose an unfair detriment on the opposing party [if she] is not estopped." *Id.* For the foregoing reasons, the Court disagrees with Hartford and finds the doctrine of judicial estoppel does not apply to Mrs. Campbell's argument.

## B. WHETHER THE DE NOVO OR ARBITRARY AND CAPRICIOUS STANDARD OF REVIEW APPLIES

The Parties do not dispute that this action pertains to a challenge of an administrative decision to deny supplemental dependent life insurance benefits under ERISA. In an ERISA action, the Court reviews "*de novo* the plan administrator's denial of ERISA benefits, unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 613 (6th Cir. 1998) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). "This *de novo* standard of review applies to the factual determinations as well as to the legal conclusions of the plan administrator." *Wilkins*, 150 F.3d at 613 (citing *Rowan v. Unum Life Ins. Co.,* 119 F.3d 433, 435 (6th Cir. 1997)). "Where a plan 'expressly grants the administrator discretionary authority to determine eligibility for benefits,' the Court shall 'review the administrator's decision to deny benefits using the 'highly deferential arbitrary and capricious standard of review.''" *Swiger v. Continental Cas. Co.,* Civil No. 05-255-ART, 2008 WL 1968346, at *5 (E.D. Ky. May 2, 2008) (quoting *Killian v. Healthsource Provident Adm'rs Inc.,* 152 F.3d 514, 520 (6th Cir. 1998)).

Here, the Parties disagree which standard of review is applicable in this case. Mrs. Campbell argues the *de novo* standard

of review applies, [DE 21, at 5-6], and Hartford contends the Court should apply the arbitrary and capricious standard of review, [DE 24, at 7-8]. The Certificate of Insurance [AR 41-62] found in the section of the Administrative Record titled "Your Benefit Plan" [AR 1-62] states, "The Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." [AR 58]. Additionally, the "Proof of Loss" subsection states, "All proof submitted must be satisfactory to Us[,]" [AR 27], and the "Policy Interpretation" subsection states, "We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy. This provision applies where the interpretation of The Policy is governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA)," [AR 29]. "We" and "Us" are defined as "the insurance company named on the face page of The Policy." [AR 31]. However, Mrs. Campbell argues the "Your Benefit Plan" section of the Administrative Record [AR 1-62], which she refers to as a "booklet-certificate," is nothing more than a summary of the Plan, so "Hartford can point to no such 'express[]' grant of discretionary authority here because it has not filed the 'Policy' or the 'Plan' with the Court." [DE 21, at 9].

Pursuant to 29 U.S.C. § 1102(a)(1), "Every employee benefit plan shall be established and maintained pursuant to a written instrument." "[T]here is no requirement . . . that the terms of an ERISA plan be contained in [a] single document. Nor does the requirement of 29 U.S.C. § 1102(a)(1), that the terms of an ERISA plan be contained in a written instrument require that it be a single document." *Rinard v. Eastern Co.,* 978 F.2d 265, 268 n. 2 (6th Cir. 1992). The types of documents that are considered part of the Plan are restricted. *Hogan v. Life Ins. Co. of North America,* 521 F. App'x 410, 415 (6th Cir. 2013) (citing *Cigna Corp. v. Amara,* 563 U.S. 421, 131 S. Ct. 1866, 1877 (2011)). In *Amara*, "[t]he Court concluded 'that summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the *terms* of the plan.'" *Id.* (quoting 131 S. Ct. at 1878). "[The Sixth Circuit] has treated group insurance policies as benefit plans . . . ." *Id.* (citing *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380-81 (1996); *Miller v. Metro. Life Ins. Co.,* 925 F.2d 979, 983-84 (6th Cir. 1991)).

Here, the "booklet-certificate" states the following:

We have issued The Policy to the Policyholder. Our name, the Policyholder's name and the Policy Number are shown above. **The provisions of The Policy, which are important to You, are summarized in this certificate** consisting of this form and any additional forms which have been made a part of this certificate. This certificate replaces any other certificate We may have given to You earlier

under The Policy. **The Policy alone is the only contract under which payment will be made. Any difference between The Policy and this certificate will be settled according to the provisions of The Policy on file with Us at Our home office.** The Policy may be inspected at the office of the Policyholder.

. . .

This document serves to meet ERISA requirements and provides important information about the Plan.

The benefits described in your booklet-certificate (Booklet) are provided under a group insurance policy (Policy) issued by the Hartford Life and Accident Insurance Company (Insurance Company) and are subject to the Policy's terms and conditions. **The Policy is incorporated into, and forms a part of, the Plan.** The Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

**A copy of the Plan is available for your review during normal working hours in the office of the Plan Administrator.**

[DE 21, at 7 (citing [AR 13, 56])].

According to Amendment to the Group Policy [DE 24-3] attached to Hartford's Response [DE 24], but not included in the Administrative Record, the so-called "booklet-certificate" [AR 1-62] has been incorporated into the Group Policy [DE 24-3] through an incorporation provision. [DE 24-3, at 10]. Pursuant to 28 U.S.C. § 1746, Scott A. Briere, Senior Medical Underwriter at Hartford, declares Hartford issued the Amendment to the Group Policy [DE 24-3], and the applicable booklet-certificate for the Plan, which

applied to Mrs. Campbell at the time of her claim, was incorporated into the Group Policy. [DE 24-1]. Additionally, the booklet-certificate states, "'**The Policy is incorporated into, and forms a part of, the Plan.**'" [DE 21, at 7 (citing [AR 56])]. The "booklet-certificate" is incorporated into the Policy, and the Policy is incorporated into the Plan, so it appears the language granting Hartford "discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy" is intended to be part of the Plan. [AR 58]; *see also* [AR 29, 56]. Moreover, the booklet-certificate also impliedly grants Hartford discretionary authority by requiring all proof be "satisfactory" to Hartford by stating, "All proof submitted must be satisfactory to Us." *See* [AR 27]; *see also Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 567 (6th Cir. 2013) ("This Court has found "satisfactory proof," and similar phrases, sufficiently clear to grant discretion to administrators and fiduciaries.") (citing *Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 556 (6th Cir. 1998) (en banc); *Miller v. Metro. Life Ins. Co.,* 925 F.2d 979, 983 (6th Cir. 1991)).

However, "[t]he Court's review of [Hartford's] administrative decision must be based only upon the material in the administrative record, and therefore the Court 'may not consider new evidence or look beyond the record that was before the plan administrator.'" *Swiger,* 2008 WL 1968346, at *6 (quoting *Wilkins v. Baptist*

*Healthcare Sys., Inc.,* 150 F.3d 609, 616 (6th Cir. 1998)). Hartford correctly asserts, "Outside evidence is only considered with regard to procedural challenges to the administrator's decision." [DE 24, at 8 (citing *Wilkins,* 150 F.3d at 619)].

To support its argument that the Court should apply the arbitrary and capricious standard of review, Hartford cites *Temponeras v. United States Life Ins. Co. of America,* 185 F. Supp. 3d 1010 (S.D. Ohio 2016) for support, but *Temponeras* fails to bolster Hartford's argument. [DE 24, at 9-10 (citing *Temponeras,* 185 F. Supp. 3d at 1017-18)]. In *Temponeras,* a case where "[t]he group policy itself [was] not in the record, and the Certificate [of Coverage] [did] not include language granting discretion to [the insurer], the Southern District of Ohio applied *de novo* review "[b]ecause the only language conferring discretionary decision-making authority [was] found in an 'Addendum' to [a Summary Plan Description]." *Temponeras,* 185 F. Supp. 3d at 1017.

Here, the Amendment to the Group Policy [DE 24-3] is not in the Administrative Record, and there is no provision within the Administrative Record that incorporates the booklet-certificate into the Policy, which forms a part of the Plan. Accordingly, without the Amendment to the Group Policy [DE 24-3], Hartford's underwriting department had no indication that the booklet-certificate was incorporated into the Policy. Moreover, Mrs. Campbell contests Hartford's assertions that the booklet-

certificate is a Plan document, and in the Declaration [DE 24-1] provided by Hartford, Senior Medical Underwriter Briere acknowledges the document in question [AR 1-62] is, in fact, a "Booklet-Certificate for the Plan," which is a summary document. The booklet-certificate even describes itself as a summary of the Policy. *See* [DE 21, at 7 (citing [AR 13, 56])("**The provisions of The Policy, which are important to You, are summarized in this certificate** consisting of this form and any additional forms which have been made a part of this certificate.")]. Since the only language granting Hartford discretionary authority is found in a summary document, the booklet-certificate, and the Amendment to the Group Policy [DE 24-3], including its language incorporating the booklet-certificate into the Policy, and, therefore, the Plan, was not part of the Administrative Record, the Court will apply the *de novo* standard of review.

## C. THE DE NOVO STANDARD OF REVIEW

"This *de novo* standard of review applies to the factual determinations as well as to the legal conclusions of the plan administrator." *Wilkins,* 150 F.3d at 613 (citing *Rowan,* 119 F.3d at 435). "When conducting a *de novo* review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." *Id*. at 616 (citing *Perry v. Simplicity Engineering, a Div. of Lukens General Industries, Inc.*, 900 F.2d

963, 966 (6th Cir. 1990); *Rowan,* 119 F.3d at 437). "When a court reviews a decision *de novo,* it simply decides whether or not it agrees with the decision under review." *Perry*, 900 F.2d at 966. "In the ERISA context, the role of the reviewing federal court is to determine whether the administrator or fiduciary made a correct decision, applying a *de novo* standard." *Id.*

### III. DISCUSSION

Since the Plan is governed by ERISA, the Court must "apply federal common law rules of contract interpretation in making [its] determination." *Perez,* 150 F.3d at 556 (citing *Pitcher v. Principal Mut. Life Ins. Co.,* 93 F.3d 407, 411 (7th Cir. 1996)). "In developing federal common law rules of contract interpretation, [the Court takes] direction from both state law and general contract law principles." *Id.* (citing *Regents of the Univ. of Michigan v. Agency Rent-A-Car,* 122 F.3d 336, 339 (6th Cir. 1997)). "The general principles of contract law dictate that [the Court] interpret the Plan's provisions according to their plain meaning, in an ordinary and popular sense." *Id.* "In applying this plain meaning analysis, [the Court] 'must give effect to the unambiguous terms of an ERISA plan.'" *Id.* (quoting *Lake v. Metropolitan Life Ins. Co.,* 73 F.3d 1372, 1379 (6th Cir. 1996)). "'The rule of *contra proferentum* provides that ambiguous contract provisions in ERISA-governed insurance contracts should be construed against the drafting party.'" *Clemons v. Norton Healthcare Inc. Retirement*

24

*Plan,* 890 F.3d 254, 265 (6th Cir. 2018) (quoting *Perez,* at 557 n.7). "Where plan language is ambiguous, extrinsic evidence may be considered to discern the purpose of the plan as the average employee would have reasonably understood it." *Lipker v. AK Steel Corp.,* 698 F.3d 923, 928 (6th Cir. 2012) (citing *Kolkowski v. Goodrich Corp.,* 448 F.3d 843, 850 (6th Cir. 2006)). "The Plan is ambiguous if it is susceptible to multiple reasonable interpretations, not just because clever lawyers can disagree over the meaning of terms." *Clemons,* 890 F.3d at 269 (citing *Perez,* 150 F.3d at 557 n.7).

## A. MISREPRESENTATIONS IN THE PERSONAL HEALTH APPLICATION

The Campbells' alleged misrepresentation arises from them checking "No" to Question No. 4, which asked, in pertinent part, if in the past five (5) years Mr. Campbell had "been diagnosed or treated for drug or alcohol abuse (excluding support groups) . . . ." [AR 840]. "[A]n insurer is entitled to avoid an insurance policy if the insurer proves that the insured made a fraudulent or material misrepresentation in his insurance application that justifiably induced the issuance of the policy." *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 943 (6th Cir. 1997) (citing *Tingle v. Pacific Mutual Insurance Co.*, 837 F. Supp. 191 (W.D. La. 1993)), *abrogated on other grounds by UNUM Life Insurance Co. v. Ward,* 526 U.S. 358 (1999), and *Kentucky Association of Health Plans, Inc. v. Miller,* 538 U.S. 329 (2003). Similarly, Kentucky

law "provides that misrepresentations in an insurance policy application 'shall not prevent a recovery under the policy or contract unless either: (1) Fraudulent; or (2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or (3) The insurer in good faith would [ ] not have issued the policy or contract . . . .'" *Nationwide Mut. Fire Ins. Co. v. Nelson*, 912 F. Supp. 2d 452, 454 (E.D. Ky. 2012) (quoting Ky. Rev. Stat. § 304.14-110). "[W]here the policy would not have issued without the false statement, the statute voids the policy at its inception—as if the policy never existed." *Id.* (citing *Progressive Specialty Ins. Co. v. Rosing,* 891 F. Supp. 378, 380 (W.D. Ky. 1995)). Under Kentucky law, an insurer "may void a policy based on a material representation regardless of the applicant's intent." *Id.* (citing *Cont'l Cas. Co. v. Law Offices of Melbourne Mills, Jr., PLLC,* 676 F.3d 534, 539 (6th Cir. 2012); *Upton v. W. Life Ins. Co.,* 492 F.2d 148, 149 (6th Cir. 1974); *John Hancock Mut. Life Ins. Co. v. Conway,* 240 S.W.2d 644, 646 (Ky. 1951); *Ford v. Commonwealth Life Ins. Co.,* 252 Ky. 565, 67 S.W.2d 950, 950 (1934); *Sergent v. Auto-Owners Life Ins. Co.,* No. 2009–CA–001430–MR, 2010 WL 4137448, at *3 (Ky. Ct. App. Oct. 22, 2010); *Hornback v. Bankers Life Ins. Co.,* 176 S.W.3d 699, 705 (Ky. Ct. App. 2005)).

In the present case, Hartford does not claim Mr. Campbell was diagnosed with "alcohol abuse." Instead, Hartford argues that since ERISA documents must be interpreted "according to their plain

meaning in an ordinary and popular sense[,]'" the Campbells should have checked "Yes" because Mr. Campbell was diagnosed and treated for "alcohol dependence," which Hartford posits is another form of "alcohol abuse." [DE 24, at 14-15 (quoting *Bd. Of Trustees v. Moore*, 800 F.3d 214, 222 (6th Cir. 2015))]. Moreover, Hartford contends that even though the diagnostic codes for "alcohol abuse" and "alcohol dependence" are different, they are both categorized "under Abuse > Alcohol, with subtype 'dependent' point to [the diagnostic code for 'alcohol dependence'] and subtype 'non-dependent' pointing to [the diagnostic code for 'alcohol abuse']." *Id*. at 16. Hartford explains, "[T]he two diagnoses are distinct only in the sense that one can 'abuse' alcohol with or without being 'dependent' on it." *Id*. at 17. However, the Court does not agree with Hartford's interpretation.

The closest thing Hartford points to that can be remotely interpreted as an "alcohol abuse" diagnosis are Mr. Campbell's oncologists' April 12, 2016, April 18, 2016, and April 21, 2016, notes showing he had "prior alcohol abuse" and a "[h]istory of alcohol abuse." [AR 465, 479, 483]. However, "prior alcohol abuse" and "a history of alcohol abuse" do not necessarily mean Mr. Campbell was still abusing alcohol or had in the five [5] years prior to answering Question No. 4. A 2016 diagnosis of *past* alcohol abuse does not equate to a diagnosis of alcohol abuse, insofar as the Campbells' answer to Question No. 4 is concerned. There is no

indication when the alleged alcohol abuse occurred nor a diagnosis of what would have been at that time "current" alcohol abuse. Moreover, the oncologists' notes were made when Mr. Campbell was diagnosed with cancer and not as part of a diagnosis or treatment of his issues related to alcohol. Instead, as Hartford states, the notes merely "described the medical history preceding his esophageal issues . . . ." [DE 24, at 17].

Regarding the plain meaning interpretation of Question No. 4, the Court does not agree with Hartford that the Campbells made a misrepresentation by checking "No." The Campbells were asked if Mr. Campbell had been diagnosed or treated for "alcohol abuse" in the past five (5) years. He had not. Without even delving into the technical definitions found in the respective diagnostic codes for "Alcohol Dependence" and "Alcohol Abuse," "dependence" and "abuse" are separate words with separate plain meanings.

Just because a person is dependent on alcohol does not necessarily mean they abuse it, especially not in the preceding five (5) years. Even if that were the case, and Mr. Campbell's alcohol-related treatments, such as being prescribed Topamax, could be construed as him being treated for alcohol abuse, his records show he was being treated for "alcohol dependence." When the Campbells answered Question No. 4, to their knowledge, Mr. Campbell had not been treated for alcohol abuse because that is what his records showed.

When the diagnostic codes are considered, the gap between alcohol "abuse" and "dependence" widens further because they have distinct criteria and include the following notes:

> (Note--a diagnosis of Alcohol Dependence can never be changed to a diagnosis of Alcohol Abuse. The DSM also states that "The differentiation of Sustained Full Remission from recovered (no current Substance Abuse Disorder) requires consideration of the length of time since the last period of disturbance, the total duration of the disturbance, and the need for continued evaluation.")
>
> . . .
>
> B. The symptoms [of alcohol abuse] have never met the criteria for Alcohol Dependence.
>
> (Note that there are no course specifiers for Alcohol Abuse. A diagnosis of Alcohol Abuse is for life--it can never be removed from your medical chart no matter how much you improve.)
>
> from DSM-IV-TR[.]
>
> The HAMS Harm Reduction Network, *available at*: http://hams.cc/abuse/ (last visited Oct. 2, 2017).

[AR 145-47]. Based on either the plain meanings or the technical meanings found in the diagnostic codes, alcohol abuse and alcohol dependence are not synonymous.

Question No. 4's exclusion of support groups only adds to the ambiguity of what information Hartford was seeking and provides further support to the Campbells' argument that there was a distinction between treatment for alcohol abuse and other types of alcohol-related issues, such as dependence. *See* [DE 21, at 11-12]. Based on the plain meaning of the language used in Question No. 4,

the Campbells are correct that they were "not obligated to disclose that [Mr. Campbell] attended AA." *Id*. The exclusion of such support groups would reasonably lead an applicant to understand that the question was targeted *only* at the diagnosis and treatment of alcohol abuse. For the foregoing reasons, and since the Campbells were under no duty to disclose information that was not specifically requested by Hartford, their failure to check "Yes" due to Mr. Campbell's alcohol dependence diagnoses and treatments was not a misrepresentation because it was true that Mr. Campbell had not been diagnosed or treated for "alcohol abuse" in the five (5) years prior to answering Question No. 4. *Metropolitan Life Ins. Co. v. Conger*, 474 F.3d 258, 267 (6th Cir. 2007) ("[A]pplicants for insurance have no duty to disclose undiagnosed symptoms or medical history not specifically requested by an insurance company.")). Therefore, Hartford's decision to deny Mrs. Campbell's claim for Mr. Campbell's supplemental life insurance benefit and rescind coverage must be reversed, and Hartford must remit to Mrs. Campbell her late husband's supplemental life insurance benefit in the amount of $190,000.00. To the extent Mrs. Campbell requests interest, attorney's fees, and costs, pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), [DE 10; DE 12; DE 25], she may file a separate motion, or the Parties may file a joint motion, specifying the amounts of each request. Accordingly,

**IT IS ORDERED** as follows:

(1) Defendant Hartford Life and Accident Insurance Company's decision to deny Plaintiff Dana Campbell's claim for Gary Campbell's supplemental life insurance benefit and rescind coverage is **REVERSED**;

(2) Hartford shall **REMIT** Gary Campbell's $190,000.00 supplemental life insurance benefit to Plaintiff Dana Campbell;

(3) All other claims for relief or pending motions in this matter are hereby **DENIED AS MOOT**; and

(4) The Court shall enter a separate judgment.

This 8th day of June, 2021.

Signed By:

*Joseph M. Hood*

Senior U.S. District Judge